Lattuca v. Silver, No. 605-8-09 Rdcv (Teachout, J., Dec. 15, 2010)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| **RUTLAND UNIT** | **Docket # 605-8-09 Rdcv** |

**RUSSELL LATTUCA and**
**ANN LATTUCA**

**v.**

**THOMAS SILVER**

### Findings of Fact and Conclusions of Law

This matter came before the court for a court trial on November 29, 2010. Plaintiffs Russell and Ann Lattuca were present and represented by Attorney Robert McClallen. Defendant Thomas Silver represented himself. Plaintiffs had contracted with Defendant to paint their house for $13,000, and paid a deposit of $6,500.00. They claim that Defendant breached the contract, and that therefore they terminated the project. They seek return of their deposit plus an additional amount of $4,000 based on the additional cost of $17,000 to have the work done by someone else. Defendant claims Plaintiffs breached the contract, and seeks to retain the deposit.

Based on the credible evidence, the court finds the following facts and makes the following rulings of law.

### Findings of Fact

Plaintiffs own a large Victorian house in Wallingford. Russell Lattuca is retired. He previously worked as a project superintendent on construction projects. Thomas Silver is a painter who has owned a painting sole proprietorship for several years.

In April of 2009, upon request, Mr. Silver submitted a written proposal to Mr. Lattuca to paint the house for the fixed price of $14,900.00. The work to be performed included "scrape, seal all cracks, . . . prime and two coats of paint." It included all paint and materials, as well as replacing any bad clapboards up to 15. It also included a guarantee for 10 years. No completion date was included.

The parties talked further in the presence of the Lattuca's son Joseph, who works as a superintendent for Breadloaf Construction Company. The fixed price was revised to $13,000, with "half down, $6,500." Mr. Russell Lattuca and Mr. Silver signed the written contract on May 9, 2009. No completion date was specified. Mr. Silver declined to specify a completion date because of the possibility of intervening causes for delay. The Lattucas raised no objection.

During the conversation, Joseph Lattuca asked how long the project would take. There is conflicting evidence as to the exact answer, but there is no conflict in that both Mr. Lattuca and Mr. Silver expected that the project represented three to four weeks worth of work. The court finds that the parties left that conversation with different expectations. Mr. Lattuca expected that Mr. Silver would begin right away, and finish in 3-4 weeks. Mr. Lattuca expected that Mr. Silver and a crew would work exclusively on this project starting immediately, and that it would be completed in 3-4 weeks. Mr. Silver expected that since there was no specified completion date in the contract, and that since the Lattucas had not expressed any need for urgency, he had discretion to finish the project on his own schedule during the painting season of the next several months of summer into the fall.

Mr. Lattuca kept what he calls a daily log of project progress. He testified that he kept the notes contemporaneously based on his observations, but that is not quite accurate, because as to at least one day, he recorded events that took place when he was not there and that he learned about from others. Nonetheless, the log represents a reasonable overall history of the events, if not entirely credible as to all details.

The contract was signed on Saturday, May 9. On Monday, two workers began scraping the house. On Tuesday, two workers worked parts of the day. Mr. Silver was leaving for a prearranged week-long vacation that Mr. Lattuca knew about. On Wednesday, two workers worked from 10 to 4:30. Mr. Silver had car trouble returning from Cape Cod, and did not come to the house until the following Tuesday, and then only for 10 minutes. The next day, two workers worked from 9:30 to 4:00. The following day, May 21, two workers were there from noon to 1:30. No one came for the next several days. During this period, the Lattucas became increasingly annoyed that Mr. Silver and his workers were not appearing for work on a regular schedule every day. Also, there were occasions when Mr. Silver said he would come on a specific day and did not.

Also during this time, a disagreement developed about the work. Mr. Lattuca wanted Mr. Silver to scrape down to bare wood, "like they are doing on the house down the street." Mr. Silver found that the paint clung stubbornly to the house, and concluded that there was probably lead in the paint. This did not affect the job in that he could still effectively scrape the siding to do a good job of painting according to the contract. The scraping would not, however, result in removing all the paint down to the wood.

Mr. Lattuca wanted Mr. Silver to use a grinder to remove old paint as was being done on the job that was taking place down the street. Mr. Silver does not use a grinder in his work. Although he and one of his workers experimented with a grinder on one day, he found that it was taking too long and causing damage. Grinding represents a different process than scraping. It is much more expensive. An alternative for Mr. Silver to get down to bare wood was to use a sander, but then there could be a problem with lead paint. Mr. Silver is not certified for lead paint removal, and did not want to lose his license. Mr. Lattuca told him to do it anyway, and if any inspector came around, Mr. Lattuca would just tell him that Mr. Silver was a relative. Mr. Lattuca objected to doing this. Mr.

Lattuca insisted that Mr. Silver use a grinder, and was upset with Mr. Silver for refusing to do so. Mr. Silver reasonably objected to doing the job with a grinder. It was a different type of process with a different cost than the scraping on which he had offered to do a fixed price contract, and he did not believe he could do it lawfully. This was unsatisfactory to Mr. Lattuca, who wanted him to use a grinder to take the paint down to the wood, as was being done down the street. Mr. Silver's view was that such a project would be restoring a house, not scraping and painting it. Mr. Silver said he had to do the job according to the terms of the contract, which specified scraping.

Because of these two issues, Mr. Lattuca was frustrated with the way Mr. Silver was proceeding with the work. Prior to Memorial Day weekend (May 22-25), Mr. Lattuca said that he would check to find out if the paint was lead paint and notify Mr. Silver, and if it was, Mr. Lattuca would let Mr. Silver continue with scraping. During the week between May 25 and May 29, Mr. Silver did not hear from Mr. Lattuca. He made telephone calls, but did not get a call back from Mr. Lattuca.

On June 1, 2009, Mr. Lattuca terminated Mr. Silver for not showing up. There is conflicting testimony about whether or not Mr. Lattuca gave Mr. Silver a warning 3 days earlier. Mr. Lattuca testified that on May 29, 2009, he told Mr. Silver that he wanted to terminate him for not progressing satisfactorily with the job, but would give him another week as a last chance. Mr. Lattuca further testified that Mr. Silver said he would be there the next day (May 30), and then did not come as promised. Mr. Silver denies that such a conference took place. In any event, it is undisputed that on June 1, 2009, Mr. Lattuca told Mr. Silver he was terminating him from the work, and that Mr. Lattuca's reason for the termination was that Mr. Silver was not showing up and making progress on the job.

Mr. Silver did not agree to termination. He said he wanted to complete the contract. He believed that Mr. Lattuca was just upset, and he believed that Mr. Lattuca would "get over it" and want him to continue working. On this basis, he left his ladders there for two weeks. During this period, he told Mr. Lattuca that he wanted to continue to do the contract. Mr. Lattuca did not want him to, and eventually Mr. Silver removed his ladders.

On May 9, 2009, the day the contract was signed, Mr. Lattuca had given Mr. Silver a check for $6,500 pursuant to the written contract. Mr. Silver used some of those funds to pay employees and some to buy primer paint. He was able to use the primer on another job later that season.

Mr. Silver estimates that the value of the work he did on the project was $1,300.

Mr. Lattuca entered into a contract with Dale Lincoln to do the job for $14,700. Mr. Lincoln started, but found the job too big for him. He stopped.

On August 28, 2010, Mr. Lattuca made a contract with Quality Painting and Staining to do the job for $17,000. Quality Painting and Staining did the work, starting around September 15 and ending around November 12. The work started two weeks

after the contract was signed, and took approximately eight weeks. Mr. Lattuca found the work satisfactory, and made no complaint about the length of time the job took.

Conclusions of Law

Mr. Lattuca claims that Mr. Silver breached the contract by not doing the work within the time he said he would do it. Mr. Lattuca seeks damages in the form of return of the $6,500 deposit, and $4,000 for the additional cost of the replacement contract, to put him in the position he would have been in if the contract had not been breached. Mr. Silver claims that Mr. Lattuca breached the contract by wrongfully terminating him, and seeks to retain the $6,500 deposit.

Plaintiff's evidence does not support a breach of contract by Mr. Silver. A party claiming breach of contract must prove that there was a contract between the parties, the duties and obligations established by the contract, and the fact that the opposing party failed to fulfill a duty or obligation established by the contract. Mr. Lattuca claims a breach of obligation to perform the contract within a period of 3-4 weeks. He also claims that Mr. Silver did not come on May 30th after saying he would, when Mr. Lattuca gave him another chance on May 29th.

The evidence does not support Mr. Lattuca's position that a term of the contract was to complete the work in 3-4 weeks. There is no term regarding work schedule or completion date in the contract. In this case, the parties had a written contract with clear terms, but there is no term regarding time. The parties did not agree to any term that indicates that time was of the essence of the contract. Mr. Lattuca essentially asks the court to add his interpretation of the conversation between Joseph Lattuca and Mr. Silver about the length of time needed to do to the work to the contract, and make it an enforceable term of the contract. As a matter of law, however, it was not an express term of the contract.

When a contract is silent as to time, the law implies a "reasonable" time. See Restatement (Second) of Contracts § 204. The court will not imply a term that would be the shortest possible time it would take if Mr. Silver had a full crew working on it full time. That is not what Mr. Silver agreed to; in fact he refused to agree to any specific completion date. While Mr. Silver's argument that he had the entire summer and fall to complete the work is probably stretching the limits of a "reasonable" time for a 3-4 week full-time project that started on May 9th, the facts are that as of June 1, Mr. Silver had had workers on the job on approximately half the weekday workdays during that period, and some of the other days were either planned vacation days or days of rain. Thus, there was no breach of contract by Mr. Silver based on failure to meet a contract schedule, as there is no evidence that he was not proceeding with the work within an implied "reasonable" time.

Even if the court were to accept Mr. Lattuca's testimony that on Friday, May 29th, he gave Mr. Silver "another chance," the other "chance" was an additional week. Mr.

4

Lattuca did not wait an additional week. He terminated Mr. Silver unilaterally on Monday, June 1st, for failure to show up on Saturday, May 30. This was premature, as by Lattuca's own testimony, Mr. Silver had a full week to show progress. In either case, Mr. Lattuca terminated Mr. Silver's work on the contract when Mr. Silver was performing and seeking to continue to perform under the contract according to its terms. Mr. Lattuca's evidence does not show breach of contract by Mr. Silver.

"The act of an owner in preventing the contractor from performing the contract constitutes a breach. . . . Absent a material breach by the contractor, the homeowners are contractually obligated to allow the contractor to finish the job, and the homeowners' subjective satisfaction or lack thereof with the contractor's work is legally irrelevant as long as any flaws in the contractor's performance do not amount to a material breach." 13 Am. Jur. 2d Building & Construction Contracts § 75.

The evidence is clear that Mr. Silver never wanted to stop work on the contract. He had purchased the primer paint, and even when Mr. Lattuca told him to stop, he left his ladders and continued to offer to perform the contract. He was ready and willing to complete performance, but was prevented from doing so by Mr. Lattuca's termination of him. The facts support Mr. Silver's position that it was Mr. Lattuca who breached the contract.

Mr. Silver has not, however, proved that he is entitled to retain the $6,500 deposit paid. The written contract does not specify that the "half down $6,500" deposit was non-refundable in the event of breach, or that it represented an agreed-upon liquidated damages amount. Rather, the "half down" term of the written contract shows only what the terms of the payment schedule were: one-half at signing and the other half upon completion. See Black's Law Dictionary 1165 (8th ed. 2004) (defining "down payment" as "[t]he portion of a purchase price paid in cash (or its equivalent) at the time the sale agreement is executed"); see also J.SH Sec. Indus. D.C.S. Ltd. v. Bartech Sys. Int'l Inc., No. 2:07-cv-277-LDG (GWF), 2010 WL 3118633, at *5 (D. Nev., Aug. 5, 2010) ("A down payment is a term of payment."). Thus, unless the written contract specified that any deposit paid was non-refundable or a liquidated damages amount, the contractor is not entitled to keep the whole amount upon a breach by the owner.

That does not mean that he must return the whole amount. As a matter of law, he may elect either to sue upon the contract and recover damages for breach or seek reasonable compensation for the value of the work performed. *Peist v. Richmond,* 97 Vt. 97, 99-100 (1923). If he had sued upon the contract, he would be entitled to the contract price minus the value of the cost to complete the contract. See Hydratulitall, Inc. v. Jones Inlet Marina, Inc., 899 N.Y.S.2d 266, 267 (N.Y. App. Term 2010) ("The general measure of damages in an action for breach of a fixed-price construction contract, where full performance of the contract is prevented by the owner, is 'the contract price, less payments made and less the cost of completion.'" (citation omitted)).

At the beginning of the hearing, Mr. Silver was clear that he was not seeking this remedy, and he presented no evidence related to a contract measure of damages. He did, however, seek to retain the deposit. Although he is not entitled to retain the whole of the

deposit, he is entitled to keep the amount of the value of the work he has performed, or quantum meruit. The evidence of this value is $1,300. Accordingly, Mr. Lattuca is entitled to the return of the $6,500 deposit - $1,300 = $5,200.

Dated at Rutland, Vermont this __ day of December, 2010.

_____
Mary Miles Teachout
Presiding Judge

6

**SUPERIOR COURT**                          **CIVIL DIVISION**
**RUTLAND UNIT**                            **Docket # 605-8-09 Rdcv**


**RUSSELL LATTUCA and**
**ANN LATTUCA**

**v.**

**THOMAS SILVER**


## JUDGMENT


        This action came on for trial before the court on November 29, 2010, Honorable Mary Miles Teachout presiding, and the court having entered Findings of Fact and Conclusions of Law on this day,

        It is ORDERED and ADJUDGED that the Plaintiffs recover of the Defendant in the amount of $5,200 and costs of action.


        Dated at Rutland, Vermont this __ day of December, 2010.


                                        _____
                                        Mary Miles Teachout
                                        Presiding Judge